Reed agt. Steamboat New-Haven.

<hr />

# UNITED STATES DISTRICT COURT.

WILLIAM D. REED agt. THE STEAMBOAT NEW-HAVEN AND THE NEW-YORK & ERIE RAILROAD COMPANY, claimants.

1. *Held*, that the rules of law for the government of steamers in respect to a lookout, are well settled, and are of stern necessity.

2. That the steamboat did not have such a lookout as is required by the law, (10 *How. R.* 585), and, by that failure, a *prima facie* case is made out against her, which stands, unless rebutted by clear and satisfactory proof.

3. That it is the duty of a sailing vessel, meeting a steamboat, to hold her course, and of a steamboat to avoid her. (10 *How.* 583 ; 12 *How.* 463.)

4. That, upon the facts, both vessels were mistaken as to the course of the other, as, instead of being on parallel lines, they were crossing each other's track.

5. That it was an error in the pilot of the steamer not to have known the true course of the sloop, and to have proceeded with unslackened speed.

6. That the sloop had the right to keep her course, and also a right, when she had good reason to apprehend a collision, as the steamer had taken no measures to avoid it, to endeavor herself to escape from it, and if, in making such attempt when peril was threatening, she did not adopt the most judicious course, such error of judgment would not be charged against her as a fault. (*The Genesee Chief*, 10 *How.*)

7. That the evidence in the case does not rebut the *prima facie* case made out against the steamer, by her failure to have the lookout required by the rules of law, but rather strengthens it, and she must be held liable for the damages.

*Before Hon.* C. A. INGERSOLL, *D. J.*

THE statement of the case appears in the opinion of the court.

D. McMAHON, *for libellant.*

W. R. BEBEE *and* D. B. EATON, *for claimants.*

INGERSOLL, D. J. The libellant, the owner of the sloop George M. Dallas, files his libel against the steamboat New-Haven, to recover the damages which the Dallas sustained by a collision with a barge in tow of the steamboat, on the night of the 7th day of May, A. D. 1855.

The collision took place at about ten or eleven o'clock at night, a little below Piermont dock, on the North river, and about twenty-five miles from New-York. The night was dark and cloudy; sailing vessels could not be descried at a greater distance than a half or three-quarters of a mile, and at that distance could be seen but imperfectly.

The shores of the river—it being, where the collision took place, about two miles wide—could not be distinctly seen. The wind, at the time, was about east, south-east. The course of the river where the collision took place was about north and south. Piermont dock is on the west side of the river, and runs out from the shore, on the flats, about a mile. On the afternoon of the same day, the sloop sailed from a place some distance up the river, loaded with a cargo of brick, and bound to Brooklyn. At the time of the collision, she was on her larboard tack. She had been on that tack for some time. When the steamer hove in sight, her sheets were off a few

points. She was of about seventy-five tons burden, and was manned by a captain, two deck hands, and a cook. Towards evening of the same day, the steamer sailed from New-York, bound to Piermont, with three partly loaded barges in tow; one being on her starboard side, and the other two on her larboard side. The outer larboard barge struck the sloop on her larboard quarter, about twelve feet from her stern, making a hole in the sloop about six feet wide, in consequence of which the sloop soon filled with water and sunk. The steamer was forty-eight feet wide. One of the barges on the larboard side was thirty-two feet wide, the other forty feet. The barge on the starboard side was forty feet wide. The barges in tow of the steamer were under her sole control and direction. It is claimed, in the libel, that the collision which caused the damage to the sloop was occasioned by the fault and neglect of those having the charge of the navigation of the steamer; such fault and neglect are charged as attributable to the steamer, in several respects. Among other charges is the one that, at the time of the collision, the steamer had not a proper and competent lookout stationed on board.

The rules of law for the government of steamers, in respect to a lookout, whilst traversing waters in the night season, where sailing vessels are accustomed to navigate, are now well settled by the decisions of the highest court in this country. These rules are of stern necessity. The safety of navigation requires that they should rigidly be adhered to; and if they were universally regarded, many collisions, which from time to time take place, might be avoided.

The supreme court of the United States, in the case of *St. John* agt. *Paige*, (10 *Howard*, *p.* 585), there laid down the rule on this subject: " A competent and vigilant lookout stationed at the forward part of the vessel, and in a position best adapted to descry vessels approaching at the earliest moment, is indispensable to exempt the steamboat from blame, in case of accident in the night-time, while navigating waters on which it is accustomed to meet other water-craft." And the court, in the same case, lay down the rule that the pilot-houses in the night,

especially if dark, and the view obscured by clouds, is not a proper place for the lookout. The same court, in the case of *The Genesee Chief* agt. *Fitzhugh et al.*, (12 *Howard, page* 463), say : "It is the duty of every steamboat traversing waters where sailing vessels are often met with, to have a trustworthy and constant lookout, besides the helmsman ; and whenever a collision happens with a sailing vessel, and it appears that there was no other lookout on board the steamboat but the helmsman, or that such lookout was not stationed in the proper place, or not actually or vigilantly employed in his duty, it must be regarded as *prima facie* evidence that it was occasioned by her fault." And the same court, in the last mentioned case, page 462, have defined what, in law, is meant by a proper lookout. They say, by a proper lookout, we do not mean merely persons on deck, who look at the light, but some one in a favorable position to see, stationed near enough to the helmsman to communicate with him, and to receive communications from him, and exclusively employed in watching the movements of vessels which they are meeting or about to pass. These rules are plain, and easily to be understood. Steamers are bound to obey them ; especially are they bound to regard them when, on a dark night, they are navigating such a stream as the North river, at all times thronged with various kinds of sailing vessels, and other description of water-craft. And if they do not obey them, and a collision happens with a sailing vessel, it must be regarded as *prima facie* evidence that it was occasioned by their fault ; and the question in this part of the case is, did the New-Haven obey these salutary rules of navigation ?

At the time of the collision, the pilot of the New-Haven was at the wheel. He had been at his post in the pilot-house, which was on the forward part of the upper deck, about fifty feet aft of the stem of the vessel, from the time she left New-York.

There were also, at the time of the collision, in the pilot-house, the captain of the steamer and a hand. There were no other persons on any portion of the forward part of the boat.

The captain was not stationed there to act as a lookout. He was not then exclusively employed in watching the movements of vessels which the steamer was about to meet or pass. He saw the sloop when she first hove in sight. He immediately turned his back to her, and saw nothing more of her till just before the collision, when his attention was attracted to her by a remark of the pilot, accompanied by the ringing of the bells to slow, stop and back. The hand in the pilot-house was not stationed there to act as a lookout. He was sitting down, and did not see the sloop when she first hove in sight. He first saw her just before the collision took place. His attention was first directed to her by the remark of the pilot—just before the ringing of the bells to slow, stop and back—at a time when a collision seemed almost inevitable. There was a man sitting on the forward part of the first larboard barge. He was not one of the ship's company which belonged to the steamer. He was not stationed there by order of any one on board the steamer. He had nothing to do with her navigation. He took his position there as one of convenience. He was in no sense of the term, as the law understands it, a lookout. There was, therefore, no lookout stationed on board the steamer. Those having charge of her navigation disregarded the injunction which the law imposed upon them.

There was a peculiar necessity, in the present case, that that injunction should be obeyed. The steamer was propelling through the water, on a dark and cloudy night, at the rate of seven or eight miles an hour, where sailing vessels and other water-craft are constantly navigating, a huge mass of one hundred and sixty feet in width, when the utmost circumspection was required, in disregard of this sound rule of law. The conssquence is, that a *prima facie* case is made out that the collision complained of was occasioned by her fault and negligence. That *prima facie* case must stand, unless the respondents rebut that *prima facie* case, thus made out, by clear and satisfactory proof. Upon them rests the burden.

In considering the question whether the respondents have rebutted this *prima facie* case, so made out against the steamer,

by clear and satisfactory proof, certain rules of law should be kept in view. As a general rule, when a steamer meets a sailing vessel, whether close hauled or with the wind free, the latter has a right to keep her course, and it is the duty of the steamer to adopt such precautions as will avoid her. (*St. John* agt. *Paine et al.*, 10 *Howard*, 583.) Judge NELSON, in the last mentioned case, in speaking of the obligation of steam vessels in relation to sailing vessels, says : " They possess a power to avoid a collision not belonging to sailing vessels, even with a free wind ; the master having the steamer under his command, both by altering the helm and by stopping the engines. They are of vast power, and, when compared with crafts on our rivers and internal seas propelled by sails, exposing the latter to inevitable destruction in case of collision, and rendering it at all times difficult, and not unfrequently impossible, to get out of the way. Greater caution and vigilance are, therefore, to be exacted from those in charge of them, to avoid the dangers of the navigation. This justly results from the superior power to direct and control the course and speed of the vessel, and the serious damages consequent upon a failure to avoid the danger." And Chief Justice TANEY, in the case of *The Genesee Chief*, (12 *Howard*, 463), says : " She (the steamboat) has command of her own course and her own speed, and it is her duty to pass the approaching vessel at such a distance as to avoid all danger, when she has room ; and if the water is narrow, her speed should be checked so as to accomplish the same purpose."

It has been a great object of the parties, during the trial, to discredit the testimony of the witnesses on the opposite side, and to make it appear that they have testified falsely. This course is taken upon the assumption that the two vessels, when first discovered by each other, were pursuing their respective courses on parallel lines—the steamer going up the river, and the sloop coming down. Upon this assumption, it would follow that the witnesses, on the one side or the other, when testifying as to certain facts, had perverted the truth, and, upon this assumption, their testimony is not reconcilable. But this is not the correct assumption. The true assumption is, that

when the two vessels were first discovered by each other, they were pursuing courses which, if continued, would make them cross each other's track, though, for some reason or other, this was not noticed either by the captain or pilot of the steamer. Upon this latter assumption, the testimony of the two sets of witnesses who were on board the two vessels, as to the important facts in the case, is consistent with the truth, and entirely reconcilable, though some of the opinions which they may have respectively expressed may be founded in error. It does not appear that the steamer was steered by the compass. From the evidence, as given, it is fair to infer that she was not so steered; and it is very clear there was no compass on board the sloop.

Those having charge, therefore, of the steamer and the sloop, say—and the evidence shows they were ignorant of the exact heading of their respective vessels—when the sloop was first seen by the pilot of the steamer, she was, as near as he could judge, from about a half to three-quarters of a mile off. The pilot and the captain both state that the sloop, when first seen, was over the starboard bow of the steamer. There can be no doubt that, in this respect, they tell the truth. The pilot—assuming that the steamer was then heading a little east of north—formed the opinion that the sloop was east of the steamer, and, assuming further that the sloop was pursuing a parallel course with the steamer, and in an opposite direction, formed the opinion, if both vessels kept their course, that the sloop would pass him, on the starboard side, at a distance of from forty to sixty yards. Acting upon this supposition, he took no precautionary measures to avoid a collision, but continued on, regardless of the sloop, at the rate of speed which he had been going. In this latter assumption and opinion, if not in the former, the pilot was mistaken.

The steamer had her lights up. When these lights were first seen by those on board the sloop, they were apparently about a mile or a mile and a half distant. The steamer, when first seen by those on board the sloop, was over the sloop's larboard bow. This is testified to by those on board the sloop, and

there can be no reasonable doubt that in this respect they tell the truth. Those on board the sloop, upon the assumption that the sloop was heading to the south, formed the opinion that the steamer was to the east of the sloop; and that, if she kept an up-river course, she would pass her to the east, as the sloop, when first discovered by those on board the steamer, was over the starboard bow of the steamer; and as the steamer, when first seen by those on board the sloop, was over the larboard bow of the sloop, it follows conclusively that the two vessels could not have been sailing on parallel lines, but that the heading of each was such that, if they kept their course, they would cross each other's track. The sloop was not bound to know this, for she had a right to keep her course, and in such a case it would be the duty of the steamer to avoid her; but the steamer was bound to know this, and at an early period to take precautionary measures to avoid a collision. Those having charge of her, if they knew the true course of the two vessels, must have known there was great danger of a collision. For some reason or other, they did not know that the two vessels were bearing so as to cross each other's track. They supposed that the two vessels were sailing on parallel lines, and that as the sloop, when first seen, was over the steamer's starboard bow, that she should pass clear of her to the east; and, acting upon this supposition, she kept on her course ahead, with no slackened speed.

It was a great error on the part of the steamer, to have been ignorant of the true course of the two vessels. If the night was so dark that there was difficulty in ascertaining the true course of the sloop, then it was the duty of the steamer to have slackened her speed until danger from that cause was over. To this want of knowledge on the part of those having charge of the steamer, is mainly to be attributed the disaster now made the cause of complaint.

Ths sloop kept the course she was on when first seen by the steamer, until she got within about sixty to one hundred and fifty yards of her. Those having charge of the sloop then apprehending danger, with the view of avoiding it, kept her away

a little.  The pilot of the steamer, seeing this movement, rung his bells to slow, stop and back, and hove his wheel hard a-port. When within about thirty yards of the steamer, the sloop bore more away.  The sloop escaped a blow from the steamer and from the first barge, but was struck by the outer barge in the manner described; and such fault is charged by the respondents upon the sloop, in that the captain was not on deck attending to his duty, and that the sloop ought not to have borne away; that, by so doing, she crossed the track of the steamer, and that that caused the collision.

The captain of the sloop, in the early part of the evening, went down in the cabin to sleep, leaving his vessel in charge of the two deck hands.  At about the time the steamer hove in sight, he came on deck again, was on deck when the sloop bore away, and gave orders to have her bear away.  As has been shown, it satisfactorily appears that, when the two vessels first saw each other, they were heading so as to cross each other's track.  At the time the sloop bore away, no measures had been taken by the steamer to avoid a collision.  The sloop had a right to keep her course.  She had also a right, as she had good reason to apprehend a collision, and as the steamer had taken no measures to avoid one, to make an attempt to escape from it; and if, in making such attempt when peril was threatening, she did not adopt the most judicious course, if it should have been more judicious to tack than to bear away, such error of judgment, if error it was, should not be charged to the sloop as a fault.  The language of the court, in the case of *The Genesee Chief*, is peculiarly appropriate to this part of the case.  The court say : " We do not deem it material to inquire whether the order of the captain, (of the sailing vessel), at the moment of collision, was judicious or not." He saw the steamboat coming upon him ; her speed was not diminished, nor any measures taken to avoid a collision ; and if, in the excitement and alarm of the moment, a different order might have been more fortunate, it was the fault of the steamer to have placed him in a situation when there was no time for thought; and she is responsible for the consequences.  She

Reed agt. Steamboat New-Haven.

had the power to have passed at a safe distance, and had no right to place the sailing vessel in such jeopardy that the error of a moment might cause her destruction and endanger the lives of those on board; and if an error was committed under such circumstances, it was not a fault. The evidence in the case does not rebut the *prima facie* case made out against the steamer, by her not having stationed on board a proper lookout, but rather strengthens it. The collision was occasioned solely by her fault, and she must be responsible for the damages.

The decree of the court is, that the libellant do recover of the steamer the damages which he has sustained by the collision; and that it be referred to a commissioner, to ascertain and report what the damages are.

From this decree, appeal was taken to the circuit court of the United States, and was argued by MR. EATON *for appellant*, and by D. McMAHON *for appellee*. The court rendered the following opinion and decision, affirming the decree:

NELSON, C. J. This libel was filed by the owners of the sloop to recover damages for a collision a little below Piermont dock, on the North river, on the night of the 7th of May, 1855, in which she was run down and sunk by one of the barges of the tow of the steamboat New-Haven. The night was somewhat dark and cloudy. The sloop was coming down the river, the wind about S.S.E., with a moderate breeze; the steamboat ascending, making for Piermont dock. The hands on the sloop testify that she was coming down on the west shore of the river, and that the steamboat was ascending east of her, and took a sheer to the west that led to the disaster; while the hands of the steamboat aver that she was ascending on the east shore, and that the sloop was coming down east of them, and suddenly changed her course towards the west, crossing the bows of the steamer. Judge INGERSOLL, who heard and determined the case below, held the steamer was in fault in not having a competent lookout stationed in the forward part of the boat, whose duty it was to descry, and report

to the proper officer, vessels approaching at the earliest possible moment. She had no lookout, in the maritime sense of that term. The pilot and captain were on the pilot house, which was some fifty feet from the stem of the vessel; at the time of the collision, the pilot was at the wheel. There seems to have been no person on board whose especial duty it was to look out for vessels ahead. We have repeatedly held that this neglect was a fault, in the navigation of a vessel, that would charge her in case of the happening of a collision.

It is insisted, for the respondents, that the sloop was in fault also, for not keeping her course, and that the sudden change of it led to the collision. We are not satisfied that any change of course took place on her part until the danger of a collision was impending; and further, we think, if there had been a competent and vigilant lookout on the steamer, the disaster might have been avoided. Judge INGERSOLL has examined the evidence with great care, and has stated the reason at large for his conclusion in charging the New-Haven; and we fully concur in the views he has taken of the case, and the result to which he arrived. It is a matter of surprise that masters or steamboats should be found so frequently neglectful of their duty, in omitting to station a lookout at a proper place on the boat, especially in dark and cloudy weather, after the necessity of the observance of it has been so repeatedly enforced by the courts, and several condemnations of vessels for the omission. The duty was most manifest in this case, considering the weather, and the moving mass, upon the river, of one hundred and sixty feet width, comprising the steamboat and her barges.

Decree affirmed.